RENDERED: AUGUST 22, 2024
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0480-DG

BLUEGRASS TRUST FOR HISTORIC PRESERVATION                    APPELLANTS

V.                ON REVIEW FROM COURT OF APPEALS
                  NO. 2020-CA-0726
                  FAYETTE CIRCUIT COURT
                  NO.18-CI-03781

LEXINGTON FAYETTE URBAN COUNTY                    APPELLEES
GOVERNMENT
PLANNING COMMISSION;
COMMONWEALTH OF KENTUCKY, EX REL.
RUSSELL COLEMAN, ATTORNEY
GENERAL; THE RESIDENCES AT SOUTH
HILL, LLC; AND WILLIAM WILSON

**OPINION OF THE COURT BY JUSTICE CONLEY**

**<u>AFFIRMING IN PART AND REVERSING IN PART</u>**

Kentucky Revised Statute (KRS) 100.3471 authorizes the circuit court to impose an appeal bond on all appeals from the circuit court in cases involving KRS Chapter 100 disputes; that is, involving zoning and land use disputes. When this bond is imposed it operates as a jurisdictional requirement upon the Court of Appeals, and failure to post the bond requires dismissal of the appeal. The constitution, however, guarantees every Kentuckian at least one right of appeal to the next highest court. Ky. Const. § 115. These cases present the question of whether KRS 100.3471 is constitutional. Striking down a statute as unconstitutional is the gravest power this Court possesses and must be

exercised with great caution. When it is shown, however, that a statute on its face cannot under any circumstances be constitutionally enforced, then striking down that statute as null, void, and of no effect is the only remedy. Accordingly, we hold KRS 100.3471 is unconstitutional since it encumbers the individual right of Kentuckians to at least one appeal; and, in so doing, it invades the rule-making power of this Court and operates to strip the Court of Appeals of its inherent appellate jurisdiction. For the following reasons, we reverse the Court of Appeals but affirm the circuit court on the underlying merits.

## I. Facts

Beauty, it is often said, is in the eyes of the beholder. This case raises the question of whether contribution to historical character is also in the eyes of the beholder. The Commonwealth Building, located within the H-1 Historical Overlay Zone of South Hill Historic District in Lexington, was built in 1958 or 1960.[1] The Appellants describe it as "a rare and increasingly threatened mid-twentieth century modern commercial structure[.]" The building had been owned by the Commonwealth of Kentucky until its purchase in 2017 by The Residences at South Hill, LLC (The Residences). After a year of ownership, The Residences sought a Certificate of Appropriateness from the Board of Architectural Review (BOAR) to demolish the building and erect a five-story apartment complex. The BOAR approved the certificates. Several appeals were

---

[1] The record is ambiguous as it states the building was constructed in 1958 but also that the South Hill Historic District was designated in 1978 and the Commonwealth Building existed for eighteen years prior.

taken from that decision by interested parties. The Residences appealed certain conditions imposed by the BOAR. The Historic South Hill Neighborhood Association (HSHNA) appealed concerning the BOAR's conclusion that there was no reasonable economic return on the property and to disallow demolition would amount to a taking of The Residences' property. Instead, the HSHNA supported demolition on the basis that the Commonwealth Building is a non-contributing structure to the historic character of South Hill. Bluegrass Trust for Historic Preservation (Bluegrass Trust) appealed the certificate for demolition outright, arguing the Commonwealth Building can provide a reasonable economic return with renovations, and that the building does contribute to the historic character of South Hill.

The Planning Commission heard the appeal *de novo*. The record discloses that several expert and lay persons testified regarding the specific question of whether the Commonwealth Building is a contributing structure to the historic character of South Hill. Prior to that hearing, The Residences and HSHNA reached an agreement that they would ask the Commission to approve demolition solely on that issue of non-contribution rather than on the economic viability and taking question.[2] The first staffer to testify was Ms. Keyu Yan. Ms. Yan testified the Kentucky Heritage Council confirmed the Commonwealth Building is not a contributing structure by federal standards, nor was the building in the process of being listed as such. She also testified an

---

[2] The HSHNA was concerned that approval of demolition based on that theory would set a dangerous precedent for other buildings not only in its historic district, but others as well.

inventory from the National Register of Historic Places was submitted by the Heritage Council, describing the Commonwealth Building as a "two-story large white brick building."

Ms. Yan further testified the South Hill district is characterized by Federal and Greek Revival architecture, as well as Italianate and Queen Anne styles, per the H-1 Design Review Guidelines' Brief Overview of Lexington's Historic Districts and Landmarks. She also stated the 2009 Downtown Lexington Building Inventory, prepared by the Division of Historic Preservation, did not include the Commonwealth Building when describing the South Hill district. Ms. Yan concluded her testimony by recommending demolition based on the non-contributory character of the structure to the historic district.

Next, a Ms. Kerr for the Historic Preservation staff testified. She testified the State Historic Preservation Office does have the Commonwealth Building listed as a contributing structure. She further commented that the mid-twentieth century style of the Commonwealth Building is not necessarily a negative as compared to the rest of the South Hill district, as all H-1 zones contain a wide-range of architectural styles. Berry Dennis then testified, also on behalf of the Historic Preservation staff. He testified the staff did not recommend demolition to the BOAR; and to the contrary, concluded demolition would adversely affect the district. The staff concluded the Commonwealth Building is significant and contributes to the character of the district, in that the architectural design is "sadly under-appreciated and disappearing[.]"

4

The next to testify were attorneys for respective parties and various citizens. Both sides were supported by the various citizens, so we pass over their arguments and testimony. David Cohen, chairman of the LFUCG Historic Preservation Commission, testified the building is included in the H-1 Overlay district and does contribute to the character of the district. Finally, Jackson Oslan read a letter from the State Historic Preservation Office. This letter detailed that Office's opinion that the Commonwealth Building is a contributing structure because of its eligibility for inclusion on the National Register for Historic Places in 2018; as well as its demonstration of architectural variety and brick-and-mortar history of Lexington.

The Planning Commission voted to uphold the BOAR's decision, and issued its own findings of fact, to wit: the age of the Commonwealth Building "differs dramatically from the age of the buildings that formed the basis for the creation of the South Hill Historic District[,]" and that the National Historic Register of Historic Places Nominating Form did not list the building or its architectural style, instead referring to those styles from the 19th and early 20th centuries. Second, the mid-twentieth century design of the building is "dramatically different" from those other architectural styles. These two factors combined demonstrate the Commonwealth Building was not considered when establishing the South Hill Historic District or considered a contributing structure at the time of the establishment of the district. Third, that cosmetic modifications to the exterior, including windows, stairs, and railings over the years, had rendered the structure "not even an intact example of the

architecture of the period in which it was constructed." Finally, because the building had been owned for almost its entire existence by the Commonwealth, it had undergone internal and external modifications without oversight by the BOAR. The Commission concluded,

> the building does not add to the District's sense of time and place or historical development. The building, because of its age, architecture, location and use, was never effectively part of the South Hill neighborhood. The building is simply a one-of-a-kind structure built and operated by the Commonwealth of Kentucky which has had no influence on other buildings or development within the District.

Bluegrass Trust appealed. The Fayette Circuit Court concluded the Planning Commission's action was supported by substantial evidence. After summarizing the various testimonies and evidence the circuit court opined,

> This Court agrees that BGT did present a compelling case at the hearing in support of its position. Much like a jury evaluating evidence presented to it in trial, the Planning Commission heard from all sides in this dispute and was tasked with the responsibility of weighing the information, accessing [sic] credibility and drawing reasonable inferences as it applied that to the ordinances. The party presenting the most witnesses or the only "expert" witnesses does not necessary prevail. This Court is of the belief that information, evidence and argument presented by South Hill at the Planning Commission hearing was enough to satisfy the "substantial evidence" standard that this Court must adhere to. There was enough evidence and information upon which a reasonable member of the Planning Commission could find as he/she did.

Bluegrass Trust appealed again. It is unnecessary to detail the record regarding the appeal bond, except to note that Bluegrass Trust did not post the bond and instead argued it had insufficient funds as a charitable organization to do so. The Court of Appeals concluded KRS 100.3471 is constitutional and

6

therefore it did not have jurisdiction because of Bluegrass Trust's failure to post the ordered bond. The Court of Appeals nonetheless briefly offered in dictum that had it jurisdiction, it would affirm the trial court.

## II.  Standards of Review

This case presents two pure questions of law as to the constitutionality of KRS 100.3471. "It is a well established principle that 'a facial challenge to a legislative Act is … the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.'" *Harris v. Commonwealth*, 338 S.W.3d 222, 229 (Ky. 2011) (quoting *Rust v. Sullivan*, 500 U.S. 173, 183 (1991)). The alleged violation must be "clear, complete, and unmistakable in order to find the law unconstitutional." *Id.* (quoting *Kentucky Industrial Utility Customers, Inc. v. Kentucky Utilities Co.,* 983 S.W.2d 493, 499 (Ky. 1998)). Questions of constitutional and statutory construction are reviewed *de novo* by this Court, and we give no deference to the lower courts. *Louisville and Jefferson Cnty. Metro. Sewer Dist. v. Bischoff,* 248 S.W.3d 533, 535 (Ky. 2007). When interpreting both the constitution and statutes, we understand the words used in their plain and ordinary meaning. *Westerfield v. Ward*, 599 S.W.3d 738, 747 (Ky. 2019). Our task is to effectuate the intent of the framers, and it is "presumed that in framing the constitution great care was exercised in the language used to convey its meaning and as little as possible left to implication." *Id.* at 748 (quoting *City of Louisville v. German,* 150 S.W.2d 931, 935 (Ky. 1940)).

Generally, it is not within the province of this Court to question the purposes of a statute—"the propriety, wisdom and expediency of statutory enactments are exclusively legislative matters." *Hallahan v. Mittlebeeler*, 373 S.W.2d 726, 727 (Ky. 1963). Nonetheless, when it comes to the separation of powers, we have recognized the indubitable principle that "the power to declare a legislative enactment unconstitutional when its enactment violates constitutional principles is solidly within the Court's constitutional authority." *Bevin v. Commonwealth ex re. Beshear*, 563 S.W.3d 74, 82 (Ky. 2018). "To avoid deciding the case because of 'legislative discretion,' 'legislative function,' etc., would be a denigration of our own constitutional duty." *Id.* (quoting *Rose v. Council for Better Education, Inc.*, 790 S.W.2d 186, 209 (Ky. 1989)). Moreover, it is the judiciary "to whom the protection of the rights of the individual is by the constitution especially confided, interposing its shield between him and the sword of usurped authority, the darts of oppression, and the shafts of faction and violence." St. George Tucker, *View of the Constitution of the United States With Selected Writings* 91, 293 (Liberty Fund, Inc., 1999). In the circumstances presented by this case, "[t]o desist from declaring the meaning of constitutional language would be an abdication of our constitutional duty." *Bevin*, 563 S.W.3d at 83.

As to the underlying merits, we review this matter for arbitrariness. *American Beauty Homes Corp. v. Louisville and Jefferson County Planning and Zoning Commission*, 379 S.W.2d 450, 456 (Ky. 1964). Essentially this focuses our review on "(1) action in excess of granted powers, (2) lack of procedural due

8

process, and (3) lack of substantial evidentiary support[.]" *Id.* at 454.

Nonetheless, "[i]t is possible that other apparently unrelated matters of law

may be considered. Judicial review of legal questions cannot be impaired by the

legislature." *Id.* at 456-57 (internal footnote omitted). While review for

arbitrariness is one of the laxer standards of review employed by courts, that

should not distract from the fact that this standard

> is basically founded upon the independent exercise of judicial
> power, and limitations imposed by the legislature will not prevail if
> they fail to protect the legal rights of a complaining party. As we
> have heretofore indicated, the courts can and will safeguard those
> rights when questions of law properly present the ultimate issue of
> arbitrary action on the part of an administrative agency.

*Id.* at 457. Simply put, arbitrary power cannot exist in this Commonwealth. Ky.

Const. § 2. Where it does exist, it must be extinguished. When it is found, "it is

the sworn duty of the court to enforce provisions of the Constitution

irrespective of the consequences." *Dalton v. State Prop. and Bldg. Comm'n*, 304

S.W.2d 342, 345 (Ky. 1957).

Bluegrass Trust contends the Planning Commission engaged in a mixed

question of law and fact, and that its action fundamentally concerned the

interpretation of a zoning ordinance which calls for *de novo* review by this

Court. We reject that argument. *American Beauty Homes* is unequivocal that *de*

*novo* review of planning and zoning actions essentially nullifies the "steps taken

before the Commission[,]" and renders the "detailed administrative process . . .

a mockery." *Id.* at 455. Consequently, a *de novo* review "does not constitute a

proper judicial review of this administrative action[.]" *Id.* at 456. We do agree

9

questions of law are fit for *de novo* review, as this Court is the final authority on "what the law is." *Marbury v. Madison*, 5 U.S. 137, 177 (1803). The Commission's action, however, was not an interpretation of an ordinance but rather a determination of whether the conditions imposed by that ordinance had been met as to justify demolition. That is a question of fact reviewed for substantial evidentiary support. That standard requires only "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Smyzer v. B.F. Goodrich Chemical Co.,* 474 S.W.2d 367 (Ky. 1971).

### III.   Analysis

KRS 100.3471 was passed in 2017 and represents the General Assembly's contribution to the interminable struggle against frivolous appeals. The General Assembly declared that such unnecessary appeals in KRS Chapter 100 cases burden the courts, cause loss of jobs and tax revenue, and prevent time-sensitive projects from being completed. Acts of General Assembly, Chapter 181, H.B. 72 § 2. The statute, in pertinent part, reads, "Any party that appeals the Circuit Court's final decision made in accordance with any legal challenge under this chapter shall, upon motion of an appellee as set forth in subsection (2) of this section, be required to file an appeal bond as set forth in this section." KRS 100.3471(1). Within thirty days after the filing of a notice of appeal, "any appellee may file a motion for the Circuit Court, pursuant to the jurisdictional authority established in Rule 73.06 of the Kentucky Rules of Civil Procedure, to order the appellant to post an appeal bond, which the Circuit

Court shall impose, subject to the other requirements of this sections." *Id.* at (2). The circuit court must then determine whether it believes the appeal is presumptively frivolous or in good faith. If the former, then the bond the circuit court imposes is set at a maximum of $250,000. *Id.* at (3)(c). If the latter, then the maximum amount of the bond is $100,000. *Id.* at (3)(d). If a bond is ordered it must be posted within fifteen days, or the appeal must be dismissed. *Id.* at (3)(f). After the Court of Appeals' decision becomes final, "either the appellant or appellee" may seek costs and damages in the circuit court "to be paid to the appellee under the appeal bond". *Id.* at (4)(a). The costs and damages are "limited to the amount of the appeal bond." *Id.* at (4)(c).

### A. Legislative Authority to Mandate Appeal Bonds

Bonds on appeal have been a part of Kentucky's history since the beginning. We have previously noted that the first act establishing the Court of Appeals in 1792 provided for a bond. *Phillips v. Green,* 155 S.W.2d 841, 843 (Ky. 1941).[3] These bonds have always been understood as a penalty or a tax. *Id.* In what appears to be the first case considering appeal bonds, the legislature's authority not only to mandate appeal bonds, but to mandate the procedures as to when, where, and how that appeal bond should be posted was upheld. *Hardin v. Owings,* 4 Ky. 214 (1808). The authority to mandate appeal bonds was predicated on legislative supremacy.

> The legislative body is the supreme power of the State, and whenever it acts within the pale of its constitutional authority, the

---

[3] It would appear, however, that the *Phillips* court was referring to something very much akin to a supersedeas bond, if not exactly that; and as is made clear below, the appeal bond here is not analogous to a supersedeas bond.

judiciary is bound by it, and it is not competent to the latter tribunal to dispense with a regulation or requisition plainly prescribed by the former (its superior), or to say that this mode, that, or the other, is as good as the one dictated by the legislature[.]

*Id.* at 215. The constitutions of Kentucky as they existed prior to adoption of the 1974 Judicial Amendments all provided that the General Assembly could regulate the appellate jurisdiction of the judiciary and could grant or withhold a right of appeal. Ky. Const. Art. IV, § 2 (1799); Ky. Const. Art. IV, §§ 2; 18 (1850); Ky. Const. Art. IV, §§ 115; 132 (1891). As one opinion declared, "no one has an inherent right to appeal from a court judgment, and that the right to do so, in the absence of some constitutional provision to the contrary, rests exclusively with the Legislature, and which it may grant or withhold at its discretion." *Caddell v. Fiscal Court of Whitley Cnty.*, 79 S.W.2d 407, 408 (1935). Indeed, our predecessor court even recognized that in cases involving the constitutionality of a statute, it could do nothing if the General Assembly did not provide for an appeal—"we have no power to review except where they are brought before us within the time and in the manner prescribed by the Legislature." *Commonwealth ex rel. Dummit v. Jefferson Cnty.*, 189 S.W.2d 604, 607 (Ky. 1945).

This conception of legislative power regarding the right of appeal is no longer tenable. The constitution now declares, "In all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court," with two minor exceptions not relevant to the cases at bar. Ky. Const. § 115. This language is unambiguous and "[i]t is not allowable to interpret that which

12

needs no interpretation." *Gilbert v. Greene*, 216 S.W. 105, 108 (Ky. 1919). But these cases demonstrate that Section 115 must be explained. "Appeal to another court" presupposes that a lower court has considered the case or controversy and rendered a final judgment. In these cases, that was the circuit court. The circuit court exists by the constitution. Ky. Const. § 112. A circuit judge is a constitutional officer. Ky. Const. §§ 112; 117. A judge only exercises authority under law or equity, i.e., exercises nothing but judicial power. *American Beauty Homes*, 379 S.W.2d at 454. A court's final decisions are "judgment[s] or decree[s] . . . affecting some personal or proprietary interest defined and regulated by law[.]" *Bruce v. Fox*, 31 Ky. 447, 448 (1833). And finality is defined as "put[ting] an end to the action by declaring that the plaintiff is or is not entitled to the relief sought, and if relief is granted [the judgment] must give that relief by its own force or be enforceable without further action by the court or by process for contempt[.]" *Kentucky Heating Co. v. City of Louisville*, 198 S.W. 1150, 1152 (Ky. 1917). Once a court issues a final judgment, that judgment is appealable. CR[4] 54.02(1).

In the case before us, the circuit court exercised a power of review of an administrative action as authorized by statute. KRS 100.347(1). That procedural hurdle does not change the fact that the circuit court is a court presupposed by Section 115. The circuit court made a final decision, affecting a personal or proprietary interest, declaring the plaintiffs either were or were not entitled to the relief they sought under law. The constitution unequivocally

---

[4] Kentucky Civil Rules of Procedure.

13

declares for such instances that "there shall be allowed as a matter of right at least one appeal to another court[.]" Ky. Const. § 115. In this case, that other court is the Court of Appeals.

It has been argued, however, that there is no constitutional right to appeal from the circuit court to the Court of Appeals under Section 115. The parties cite to *Seiller Waterman, LLC v. Bardstown Capital Corp.*, to argue that Section 115 only applies to "cases originating in our court system." 643 S.W.3d 68, 80 (Ky. 2022). And since this case (and others consolidated for oral argument) originated in county Planning and Zoning Commissions, Boards of Adjustment, or Boards of Architectural Review, i.e., administratively, there is no constitutional right to appeal from the circuit court's judgment. Justice Robert Jackson once observed, "[w]e are not final because we are infallible[.]" *Brown v. Allen*, 344 U.S. 443, 540 (1953). We do well to remember that now. To err is human, and when this Court used the word "originate" we misspoke. We can admit when a mistake has been made because *stare decisis* does not bind us to fallacy. *Morrow v. Commonwealth*, 77 S.W.3d 558, 559 (Ky. 2002). A literal reading of *Seiller Waterman* does not comport with the history of our application of Section 115 to appeals from court judgments in cases originating in administrative actions. Therefore, we abrogate that portion of *Seiller Waterman* to the extent it conflicts with Section 115.

More than thirty years ago, we held that an appeal from the Court of Appeals to this Court was guaranteed by Section 115 in worker's compensation cases. *Vessels by Vessels v. Brown-Forman Distillers Corp.*, 793 S.W.2d 795,

14

798 (Ky. 1990). Worker's compensation cases are undoubtedly administrative in nature and do not "originate" within the judiciary. *Vessels'* rationale was short and to the point. Section 115 is "unambiguous" and "presupposes that the tribunals of review and for appeal are courts within the constitutional meaning of the word." *Id.* In other words, if a citizen has had an adjudication of his rights made by a judge, exercising judicial powers whether upon review or by appeal, then he has found himself in a court; and once a final judgment has been rendered by that court, Section 115 unambiguously guarantees one right of appeal to the next highest court. *Id.*

Vessels did not break new ground with this holding. We said as much, in so many words, in *Sarver v. Allen Cnty.*, 582 S.W.2d 40 (Ky. 1979). In that case, the Court of Appeals had suggested that its appellate jurisdiction was discretionary and not a matter of right in a case on appeal from a circuit court, which had reviewed the action of the county fiscal court. *Id.* at 43. We rejected the suggestion citing to KRS 23A.010(4)—which states direct review of an administrative decision in the circuit court is not considered an appeal but an original action—and Ky. Const. § 115. *Id.* The plain implication being that Section 115 did not apply from the fiscal court to the circuit court but does apply from the circuit court to the Court of Appeals. This is because fiscal courts traditionally exercise powers that are legislative and sometimes only quasi-judicial. *Shelton v. Smith,* 144 S.W.2d 500, 501 (Ky. 1940). The fiscal court is not a court presupposed by Section 115. *Varney v. Varney*, 609 S.W.2d 704, 705 (Ky. App. 1980). But where a person is in the circuit court, before a

15

duly elected judge, exercising purely judicial power, then he is in a court as contemplated by Section 115 and he has one right of appeal to another court once a final judgment has been rendered.[5]

As such, the General Assembly no longer has authority to impose appeal bonds. Even under the old rule, the General Assembly's authority to regulate appeals could be circumscribed by "some constitutional provision to the contrary . . . ." *Caddell*, 79 S.W.2d at 408. Section 115 does more than circumscribe this power—it negates it. Section 115 is an unmistakable renunciation of the old rule that no right of appeal existed but when and upon what terms the General Assembly dictated. Appeal bonds may have a useful and salutary purpose, but utility and authority are separate questions. The authority to impose appeal bonds was heretofore predicated on previous iterations of the constitution that did not guarantee a right of appeal and, in fact, explicitly declared such a right was a matter of legislative grace. *Hardin*, 4 Ky. at 215; *Caddell*, 79 S.W.2d at 408. That is no longer true under Section 115. Therefore, the authority no longer exists.

It has been argued that because the statute makes the imposition of the bond discretionary, it passes constitutional muster on a facial challenge. Though the amount of the bond may be discretionary up to certain limits,

---

[5] RAP (1)(A) states, "[t]hese rules govern appellate procedure in all Kentucky courts, except for special statutory proceedings in the Court of Appeals." It has been suggested that this rule applies to KRS 100.3471. But it is the circuit court that conducts all the proceedings in determining the amount of a bond before the Court of Appeals renders a decision and whether to impose costs and damages after the Court of Appeals' decision has become final. The proceedings thus take place in the circuit court, not the Court of Appeals, so RAP 1(A) cannot apply.

imposing a bond in and of itself is not discretionary. KRS 100.3471(2). But granting the point *arguendo*, the argument is unavailing because even if some Kentuckians may not have an appeal bond imposed, that changes nothing about the fact that some Kentuckians will have the bond imposed. It is the latter group that suffers the constitutional deprivation. If the former group does not suffer a constitutional deprivation, it is only because the circuit court did not impose the bond as the statute contemplated. In other words, the statute mandating an appeal bond would only be constitutional if an appeal bond is not imposed. That is not an argument for constitutionality. If a statute can only be constitutional in some cases by not being enforced, then it is unconstitutional in all cases when it is enforced; thus, the facial challenge succeeds.

It has also been suggested that because the amount of the bond is essentially discretionary, a trial court could impose only a *de minimis* amount on the bond. But the General Assembly's declared purpose in passing KRS 100.3471 is to discourage frivolous appeals in KRS Chapter 100 cases. Imposing a monetarily *de minimis* bond would not achieve that purpose.[6] It cannot be seriously contended then when a circuit court finds an appeal presumptively frivolous but only orders a *de minimis* bond, that such a bond will discourage the appeal. And if the circuit court concludes the appeal is in good faith, how does imposing a bond of any kind discourage a frivolous

---

[6] *De minimis* comes from the rule *de minimis non curat lex*. Translation: the law does not concern itself with trifles.

appeal? All that achieves is to penalize appellants with good faith, perhaps even meritorious claims, in like manner as bad faith actors filing frivolous appeals. The statute's *purpose* is to discourage frivolous appeals, but its *effect* is manifestly broader under a plain text reading.

The next argument is that an appeal bond is no different than a supersedeas bond. First, supersedeas bonds are clearly within the authority of this Court as a rule of practice and procedure. RAP[7] 63. A supersedeas bond "stay[s] enforcement of the judgment" of the trial court or Court of Appeals. RAP 63(A)(1). It "maintains the status quo and protects the prevailing party's interests." *Stars Interactive Holdings (IOM) Ltd. v. Wingate*, 594 S.W.3d 181, 184 (Ky. 2020). The appeal bond of KRS 100.3471 does not stay execution of the circuit court's judgment and the successful party before the circuit court is free to act in accordance with that judgment during the pendency of appeal. In other words, a bondholder under KRS 100.3471 would have to take out a separate supersedeas bond to preserve the status quo. That fact alone refutes any analogy to supersedeas bonds.

It is true that KRS 100.3471(2) refers to CR 73.06—which is now RAP 63(c)—so the analogy to supsersedeas bonds is implied by the statute. But RAP 63(c) only refers to the trial court's limited retention of jurisdiction to determine the sufficiency of a supersedeas bond. The legislature plainly intended to append to that "jurisdictional authority[,]" KRS 100.3471(2), a power to impose

---

[7] Kentucky Rules of Appellate Procedure.

18

another kind of bond, which it cannot do. Ky. Const. § 116. If the General Assembly intended the bond itself to be nothing other than a supersedeas bond, it could have said exactly that or referred to the former CR 73.04. It is now RAP 63(B)(3) which limits a supersedeas bond in cases involving disposition of property to "only [that] as will secure the amount recovered for the use and detention of the property, the costs of the action, costs on appeal, interest, and damages for delay." KRS 100.3471 simultaneously does less than our own rule by excluding the amount for use and detention of property, KRS 100.3471(3)(c) and (d); and more than our own rule by allowing the circuit court to consider the legal merits of the appeal in determining the bond amount. KRS 100.3471(3)(b).

By applying to good faith assertions of legal rights and failing to preserve the status quo, the bond of KRS 100.3471 admits to being nothing other than a price of admission to the Court of Appeals, and its only effect is to penalize Kentuckians wishing to challenge land-zoning decisions beyond the circuit court by exercising their constitutional right of appeal.

Finally, KRS 100.3471(4)(a)-(c) is manifestly unconstitutional as arbitrary. Ky. Const. § 2. Section 2 is broad enough to encompass traditional notions of due process. *Bd. of Ed. of Ashland v. Jayne*, 812 S.W.2d 129, 131 (Ky. 1991). Nothing in the statute predicates an appellee's award of costs and damages upon a successful outcome in the Court of Appeals. The statute allows an unsuccessful appellee in the Court of Appeals to return to the circuit court and seek costs and damages from the successful appellant. The only

19

argument of merit offered against this interpretation is that it is highly unlikely a circuit judge would ever award costs and damages to an unsuccessful appellee. We agree. But that cannot save the constitutionality of these provisions. The reason we believe no circuit judge would ever impose costs and damages on a successful appellant is because such an outcome is essentially unjust. "[W]hatever is essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary[.]" *Id.* (quoting *Ky. Milk Marketing v. Kroger Co.*, 691 S.W.2d 893, 899 (Ky. 1985)). A successful appellant cannot be penalized for asserting his rights and pursuing his claims in a court of law; he owes nothing to an unsuccessful appellee. The Commonwealth has no legitimate interest in hindering good faith assertions of legal rights in a court of law. To the contrary, our Founding Fathers recognized the *raison d'etre* of government is the protection of rights and liberties, both personal and in property, under law. *Beard v. Smith*, 22 Ky. 430, 476-77 (1828). Even though we agree it is nigh impossible to conceive that such an outcome would ever occur, we must be cognizant that "[i]f men were angels, no government would be necessary. If angels were to govern men, neither external nor internal controls on government would be necessary." James Madison, Federalist No. 51, 319 (Rossiter, Clinton, ed., 1961). "[P]ower, lodged as it must be in human hands, will ever be liable to abuse." James Madison, *Writings*, Speech in the Virginia Constitutional Convention 824 (Library of America, 1999) (Jack N. Rakove, Ed.). Because KRS 100.3471(4)(a)-(c) allows for the

possibility that a successful appellant pay costs and damages to an unsuccessful appellee, we must conclude these provisions are arbitrary.

**B. General Assembly's Authority to Regulate Appellate Jurisdiction**

Having determined KRS 100.3471 is an unconstitutional deprivation of Kentuckians' right of appeal, we must next consider that portion of the statute that mandates dismissal of an appeal when the bond is not posted as ordered. KRS 100.3471(3)(f). We have to address this issue because it is linked with the Section 115 issue. It has been argued that the constitution authorizes the General Assembly to regulate the appellate jurisdiction of the Court of Appeals under Section 111(2). If that is true in the manner now argued, then we would be required to harmonize that authority with Section 115, and thereby save the constitutionality of KRS 100.3471. This question also compels us to consider the separation of powers between the General Assembly and this Court, as head of the judicial branch. Thus, we must consider and interpret the entirety of the Judicial Amendments. *Legislative Research Com'n v. Fischer*, 366 S.W.3d 905, 913 (Ky. 2012).

The Judicial Amendments were adopted in 1974 and made effective in 1976. They were a paradigmatic shift in the relation of the judiciary to the legislature. "The judicial power of the Commonwealth shall be vested exclusively in one Court of Justice . . . [and] shall constitute a unified judicial system for operation and administration." Ky. Const. § 109. As to this Court, the constitution provides it "shall have appellate jurisdiction only, except it shall have the power to issue all writs necessary in aid of its appellate

21

jurisdiction, or the complete determination of any cause, or as may be required to exercise control of the Court of Justice." Ky. Const. § 110(2)(a). Moreover, "[t]he Supreme Court shall have the power to prescribe rules governing its appellate jurisdiction, rules for the appointment of commissioners and other court personnel, and rules of practice and procedure for the Court of Justice." Ky. Const. § 116.

> As to the Court of Appeals, it

> shall have appellate jurisdiction only, except that it may be authorized by rules of the Supreme Court to review directly decisions of administrative agencies of the Commonwealth, and it may issue all writs necessary in aid of its appellate jurisdiction, or the complete determination of any cause within its appellate jurisdiction. In all other cases, it shall exercise appellate jurisdiction as provided by law.

Ky. Const. § 111(2).

The import of these several provisions is that when it comes to the appellate jurisdiction of this Court and the Court of Appeals on a constitutional level, it is the Supreme Court which exercises authority; and that authority is neither dependent upon nor constrained by the General Assembly. First, the Court of Justice is one and unified with the Supreme Court as its head. The Supreme Court and Court of Appeals exercise appellate jurisdiction only (with minor exceptions). The power to govern that appellate jurisdiction is given to this Court. That this was the understanding of the 1974 Judicial Amendments was acknowledged as early as 1978—"[t]he Constitution also gives the Supreme Court the power to define its own appellate jurisdiction as well as the jurisdiction of the Court of Appeals by the enactment of rules." *Ash v. Security*

22

*Nat. Ins. Co.*, 574 S.W.2d 346, 348 (Ky. App. 1978) (citing Ky. Const. §§ 110 and 116). Under Section 116 we govern the appellate jurisdiction of the Court of Appeals by the Rules of Appellate Procedure. These rules serve as a necessary protection to the substantive rights of Kentuckians, even those of constitutional import, because "without such rules those rights would smother in chaos and could not survive." *Cassetty v. Commonwealth*, 495 S.W.3d 129, 134 (Ky. 2016) (quoting *Brown v. Commonwealth*, 551 S.W.2d 557, 559 (Ky. 1977)). And as the case at bar readily demonstrates, under Section 110(2)(a), we govern the appellate jurisdiction of the Court of Appeals through the exercise of our own appellate jurisdiction. We need not cite the litany of cases demonstrating this Court routinely reviews lower court determinations as to the assertion or non-assertion of jurisdiction. In other words, as a general and uncontroversial proposition, it is a necessary part of this Court's appellate jurisdiction to ensure the Court of Appeals is correctly exercising its appellate jurisdiction. *See e.g., Commonwealth v. Sexton*, 566 S.W.3d 185, 196-97 (Ky. 2018).

But the parties in favor of KRS 100.3471 argue that Section 111(2) provides that the Court of Appeals can "exercise appellate jurisdiction as provided by law." And this language is the authorization allowing the General Assembly to pass an appeal bond. The parties cite to, and the Court of Appeals relied upon, *Farmer v. Commonwealth*, 423 S.W.3d 690, 692 (Ky. 2014) for this proposition. *Farmer* says, "[t]he 'as provided by law' language in the second sentence of Section 111(2) authorizes the legislature to prescribe the appellate

jurisdiction of the Court of Appeals." *Id.* The precise issue in *Farmer* concerned the authority and application of KRS 22A.020(4). *Id.* In the three cases *Farmer* cited for that holding this Court was also considering KRS 22A.020(4). *Commonwealth v. Bailey*, 71 S.W.3d 73, 77 (Ky. 2002); *Moore v. Commonwealth*, 199 S.W.3d 132, 138 (Ky. 2006); *Ballard v. Commonwealth*, 320 S.W.3d 69, 72-73 (Ky. 2010).

KRS 22A.020(4) grants the Commonwealth a right of appeal for interlocutory orders in criminal cases under certain conditions. Understood as a statutory grant of appellate jurisdiction, it has been repeatedly upheld as constitutional. *Ballard*, 320 S.W.3d at 73; *Commonwealth v. Burkhead*, 680 S.W.3d 877, 881 (Ky. 2023). We do not at all disturb these rulings; merely clarify their inapplicability to the cases at bar. KRS 22A.020(4) has been recognized as a statutory grant of appellate jurisdiction distinct from the constitutional right of appeal. *Moore*, 199 S.W.3d at 138. We have acknowledged that KRS 22A.020(4) is a unique benefit granted to the Commonwealth and is not applicable to criminal defendants. *Farmer*, 423 S.W.3d at 693. The cases we are now addressing are neither criminal nor interlocutory. KRS 22A.020(4) has no applicability whatsoever; thus, *Farmer* is not controlling as to whether the General Assembly may statutorily mandate dismissal of an appeal when that appeal is a matter of constitutional right. That question is answered by the constitution.

As demonstrated above, the right of appeal from a final order of a court is constitutionally protected in all cases civil and criminal.

24

> The constitution itself is in every real sense the supreme law . . . [and] [t]hough the legislature of a state may exercise all governmental power not denied it and may enact any law not expressly forbidden by the state or the federal constitution, where such authority has been withheld the people have declared that any act transcending that restriction or opposing that supreme law shall be void.

*Jefferson Cnty. ex rel. Grauman v. Jefferson Cnty. Fisc. Court,* 117 S.W.2d 918, 919-20 (Ky. 1938). When comparing the language of Section 111(2) with Section 115 we must also be mindful that "[i]nterpretation of the Constitution by rule of implication is hazardous; to be employed only in instances where the subject matter and language leave no doubt that the intended meaning may be thus reached with approximate certainty." *Commonwealth ex rel. Attorney General v. Howard,* 180 S.W.2d 415, 418 (Ky. 1944). As such, "if there be conflict [between two constitutional provisions] it is the duty of the court to uphold that provision containing express language relating to the subject, rather than to one dealing with matters in general terms." *Id.* Finally, "[t]he Constitution should not be construed so as to defeat the obvious intent of its framers if another interpretation may be adopted equally in accordance with the words and sense which will carry out the intent." *Grantz v. Grauman,* 302 S.W.2d 364, 367 (Ky. 1957).

Section 115 is unambiguous and specific over the quite general language of Section 111(2) that "[i]n all other cases, it shall exercise appellate jurisdiction as provided by law." It was the obvious intent of its framers that Section 115 should guarantee the right of appeal to another court in all cases civil and criminal with minor exceptions. The general language of Section

25

111(2) simply cannot be used defeat that explicit right. Instead, what Section 111(2) provides for is that the General Assembly may confer a statutory right of appeal in those instances where a constitutional right of appeal does not already exist, e.g., an interlocutory appeal in criminal cases for the Commonwealth. *Farmer*, 423 S.W.3d at 692. Section 111(2) provides no authority, however, to regulate the inherent appellate jurisdiction of the Court of Appeals granted in the self-same section. As we have noted before, jurisdiction now derives from the constitution and by filing a notice of appeal the appellant is invoking "the exercise of the inherent jurisdiction of the court as constitutionally delegated." *Johnson v. Smith*, 885 S.W.2d 994, 950 (Ky. 1994). Appellate jurisdiction is defined as "the power and authority to review, revise, correct or affirm the decisions of an inferior court, and, more particularly, to exercise the same judicial power which has been executed in the court of original jurisdiction." *Copley v. Craft*, 341 S.W.2d 70, 72 (Ky. 1960). In the cases before us, the parties were undoubtedly in a court; namely, the circuit court. And said court rendered a final judgment, i.e., a judgment affecting a personal or proprietary interest, and declaring the plaintiffs either were or were not entitled to relief they sought as regulated by law. The jurisdiction of the circuit court to review was not in doubt. KRS 100.347(1). Section 115 guarantees their right to appeal to another (i.e., next highest) court. Therefore, the Court of Appeals, properly understood, would be exercising its inherent appellate jurisdiction as provided by the constitution.

It may seem strange to predicate appellate jurisdiction in part on Section 115, but it is not unprecedented. In *Ratliff v. Fiscal Court of Caldwell Cnty.*, we considered various parts of the eminent domain condemnation statute, KRS 416.610(4) and KRS 416.620. 617 S.W.2d 36, 38-39 (Ky. 1981). This statutory scheme, in brief, allowed a circuit court to enter an interlocutory judgment on the issue of whether a condemnor had the right to take the property. *Id.* at 38. The statutes then required within thirty days of that interlocutory judgment for a bill of exceptions to be filed by the condemnee, but expressly prohibited an exception to the interlocutory judgment as to the condemnor's right to take. *Id.* at 39. Thus, it was arguable the only final judgment a condemnee could appeal was the award of damages. *Id.* at 38.

We held that Section 115 "demanded" that a condemnee have "an immediate right of appeal, which preserves the status quo," from the interlocutory judgment on the issue of the right to take because the interlocutory judgment operated to divest the condemnee of a right to ownership and possession which could not be restored to the original condition. *Id.* at 39. In so holding, however, we did not overrule the statute. Instead, we held the statutory provisions themselves were susceptible to an interpretation providing for this interlocutory appeal.́ We believe that the provisions of KRS 416.610(4) referring to an interlocutory judgment . . . allows an immediate, expedited appeal, by the condemnee of the question of the condemnor's right to take." *Id.*

27

*Ratliff* thus supports our understanding of Section 115. But, somewhat fortuitously, it also indirectly supports our understanding of Section 111(2). Granted that section was not at issue in *Ratliff* because the General Assembly has authority over eminent domain. Ky. Const. §§ 13; 195; 242. But the salient point is that the statute could have been read to deny a condemnee's right of appeal on the issue of whether the condemnor had a right to take. By applying Section 115's guarantee of a right of appeal, we instead interpreted the statute as creating a statutory right of appeal from an interlocutory judgment on that issue. And since appellate jurisdiction over interlocutory orders does not exist by the constitution but only by statute, civil rule, or common law, *Childers v. Albright*, 636 S.W.3d 523, 526 (Ky. 2021), this understanding of *Ratliff* harmonizes with our reading of Section 111(2) in *Farmer*.

Finally, we note that comity is not an issue here. We apply comity only when there is "gray area in which a line between the legislative prerogatives of the General Assembly and the rule-making authority of the courts is not easy to draw." *Ex Parte Auditor of Pub. Accounts*, 609 S.W.2d 682, 688 (Ky. 1980). Comity cannot apply to Section 115's grant of an individual right to appeal because that is not a provision regarding the rule-making power of this Court. So far as Section 111(2) is concerned, the ambiguity this Court had to resolve was not a result of the language of the constitution itself, but rather from a misapplication of *Farmer*. Having made the necessary clarifications, the line to be drawn in these cases is readily discernable and easily applicable.

Another reason not to grant comity is that we have previously struck down a statute[8] for violating the separation of powers, Ky. Const. §§ 27 and 28, because by imposing a monetary penalty its effect was to deter motions for discretionary review, both frivolous and meritorious, and "thereby limits or restricts the Kentucky Supreme Court in exercising its jurisdiction to review cases from lower courts. By so doing, it invades the constitutional power assigned exclusively to the Kentucky Supreme Court to 'exercise appellate jurisdiction as provided by *its rules.*'" *Elk Horn Coal Corp. v. Cheyenne Resources, Inc.*, 163 S.W.3d 408, 424 (Ky. 2005) (citing Ky. Const. § 110(2)(b)) (*overruled on other grounds by Calloway Cnty. Sheriff's Dept. v. Woodall*, 607 S.W.3d 557, 572-73 (Ky. 2020)). The rationale underlying this conclusion was that this Court had already promulgated a civil rule to deter frivolous appeals— the former CR 73.02(4)—thus, the subject matter of the statute pertained to the rules of practices and procedures of the Court. *Id.*

In like manner, the current rules provide ample authority to the Court of Appeals to sanction frivolous appeals, and to award "just monetary sanctions and single or double costs to the opposing party." RAP 11(4). Trials courts also have authority to sanction frivolous complaints and pleadings. CR 11. Just as the statute at issue in *Elk Horn* invaded our exclusive power to define our own rules for regulating appellate procedure in this Court under Section 110(2)(b), KRS 100.3471 invades our exclusive authority to define the rules of practice and procedure in the Court of Justice. Ky. Const. § 116. The reason is

---

[8] KRS 26A.300.

demonstrated by what is lacking in KRS 100.3471. Although we need not resolve these questions now, the statute does raise several; namely, 1) is the trial court's determination that an appeal is presumptively frivolous or in good faith a finding of fact or conclusion of law? 2) Is that determination appealable and if so, when—after the bond is imposed or after the award—and how? 3) Is the trial court's determination controlling upon the Court of Appeals? 4) What degree of deference, if any, does the Court of Appeals owe the trial court's determination if a motion for sanctions under RAP 11 is filed in that court? And 5) what is the effect of the Court of Appeals disagreeing with the circuit court, e.g., if the circuit court determines an appeal is presumptively frivolous and imposes a $250,000 bond, which is paid; but then the Court of Appeals disagrees and concludes the appeal was made in good faith but nonetheless affirms the circuit court's judgment, what then is the circuit court's authority in awarding costs and damages? Can the circuit court award the full $250,000 or, since a higher court found the appeal was in good faith, should not the costs and damages be limited to the $100,000? Why should costs and damages be awarded at all if the appeal was made in good faith? As already noted, the Commonwealth has no interest in deterring or penalizing good faith claims of legal right.

All these questions, and the lack of any answers to them in KRS 100.3471, demonstrate that the deterrence of frivolous appeals, while potentially touching upon larger economic concerns, are primarily the concern of the judiciary. Our rules vest the Court of Appeals with the necessary and

sufficient authority to sanction them speedily and with as little expense as possible; without involving the circuit court thereby avoiding procedural conundrums concomitant with that involvement.

### C. The Underlying Merits of the Certificate of Appropriateness

Lexington-Fayette Urban County Government Zoning Ordinance 13-7(a) details that the Board of Architectural Review may issue a Certificate of Appropriateness allowing for demolition of a building within an H-1 Overlay Zone. This negates any argument that merely by being within the H-1 Overlay zone, the Commonwealth Building is entitled to protection. Instead, in order for demolition to take place the BOAR must either find the building "does not contribute to the character of, and [demolition] will not adversely affect the character of the property in a zone protected by an H-1 overlay[,]" or "[n]o reasonable economic return can be realized from the property and the denial of the application would result in the taking of the property without just compensation." *Id.* at 13-7(c)(1)(b) and (c). The principal arguments offered by Bluegrass Trust to justify a conclusion that demolition is not supported by substantial evidence is the eligibility of the Commonwealth Building to be listed on the National Register of Historic Places, and the conclusion of several expert staffers below that the Commonwealth Building does contribute to the character of South Hill Historic District, and its demolition would adversely affect that character.

As to the first argument, we can only note that eligibility to be listed as an historic landmark is not tantamount to a conclusion that a structure is an

31

historic landmark. Whatever the aesthetic qualities mid-twentieth century architectural design might possess, the only reason demonstrated in this record for eligibility is the age of the Commonwealth Building; an age which the Commission determined was in fact a mark against it as concerns historical contribution. The Commission determined the historical character of South Hill was manifested by architectural designs from a hundred years ago or more, and that a mid-twentieth century building was a "one-of-a-kind structure" within the district that markedly stood out from the rest of the district. Moreover, the Commission also considered the original nomination form for when South Hill was designated an Historic District and found no evidence the Commonwealth Building was originally considered. Bluegrass Trust has argued that the building's historical value and contribution arise from the fact that it reflects the historical growth of Lexington. But nowhere is any statute or ordinance cited that forbids the Commission from referring to the original basis for historical designation. Without such a statute or ordinance, we believe the original reasons for historical designation are a highly relevant factor in determining whether any individual building can be considered a contributing structure.

The second argument essentially is that the expert staffers of various state and local bodies all testified the Commonwealth Building is a contributing structure and its demolition would adversely affect South Hill. The failure of the Commission to follow that expert testimony, Bluegrass Trust avers, is arbitrary and capricious. While the value of expert testimony, particularly on a

32

subjective topic like architectural design and beauty, may be high, it is not controlling. The Planning Commission is the body ultimately empowered to make a zoning decision within the confines set by the ordinance. Nothing Bluegrass Trust cites dictates otherwise.

For example, Zoning Ordinance 13-7(f)(b) states, "[i]n its deliberations, the Planning Commission shall give due consideration to the decision of the Board and the finding and conclusions reflected in the Board's record and shall apply the design guidelines adopted by the Historic Preservation Commission." Due consideration means due consideration; it does not mean the Planning Commission must give controlling weight to the opinions of the Historic Preservation Commission's staff. Moreover, such opinions are not the design guidelines adopted by the Commission. Similarly, Zoning Ordinance 13-3(h) merely defines Historic Preservation Office Staff. It does not contain any language that staff opinions are controlling upon the Planning Commission. Bluegrass Trust also cites the unpublished decision of *Sanders v. Howard*, 2017-CA-001392-MR, 2018 WL 6721226 (Ky. App. Dec. 21, 2018). Aside from being unpublished authority from a lower court, we do not believe *Sanders* stands for the proposition argued for.

Bluegrass Trust believes *Sanders* holds administrative bodies must give controlling weight to expert evidence when it is unrebutted. But *Sanders* reversed a State Trooper's discipline for dishonesty predicated upon her oral statements about which prescription medications she had in her system during a police luncheon. *Id.* at *1. The Trooper later made a written disclosure of her

33

prescription medications prior to taking a urinalysis test. *Id.* The written statement disclosed more drugs than her oral statement. *Id.* The test confirmed the Trooper had truthfully disclosed in writing all medications. *Id.* at *2. The trial court held, and the Court of Appeals affirmed, that disciplinary action based on dishonesty was not supported by substantial evidence because the Trial Board had ignored the written statement, and focused only on her oral statements which, the Court of Appeals observed, were taken out of context. *Id.* at *3. We find no mention of expert testimony in *Sanders,* nor do we believe *Sanders* was particularly focused on the urinalysis test. Instead, the Court of Appeals, and the trial court, focused on the written statement of the Trooper as being dispositive of whether or not she was dishonest. *Id.*

Expert testimony is indeed valuable and often necessary. But Zoning Ordinance 13-7(f) designates an appeal to the Planning Commission as a *de novo* hearing. The trial court was therefore correct to hold the Planning Commission is a factfinder analogous to a jury, free to give weight and credibility to witnesses as it sees fit. It is beyond the judiciary's authority to impose a standard of weight and credibility that must be assigned to experts in planning and zoning matters. Absent a statute or local ordinance dictating what weight an expert testimony must be given by Planning Commissions, we cannot conclude that a decision contrary to expert testimony is arbitrary, so long as the decision is supported by other substantial evidence. That other substantial evidence in this case is the undisputed fact that the Commonwealth Building is not an historical landmark in the federal Register; it

34

was not included in the original nominating form for the South Hill neighborhood as an Historic District; Ms. Yan's testimony that the Kentucky Heritage Council did not consider the structure a contributing building; and multiple near-contemporaneous documents—the Design Review Guidelines and Downtown Lexington Building Inventory—from Lexington that also did not list the Commonwealth Building.

Finally, Bluegrass Trust argues the "controlling regulation" in this matter is 36 C.F.R. § 67.5. That regulation is entitled, "Standards for evaluating significance within registered historic districts[.]" First, this regulation is not controlling. Zoning Ordinance 13-3(b) merely gives a definition of Certified Local Government; it does not incorporate or otherwise instruct the Planning Commission to conform its decisions to federal regulations. But taken as instructive authority, 36 C.F.R. § 67.5(a)(2) clearly acknowledges that a particular building within an historic district can be considered non-contributing, and the regulation goes on to state,

> [o]rdinarily buildings that have been built within the past 50 years shall not be considered to contribute to the significance of a district unless a strong justification concerning their historical or architectural merit is given or the historical attributes of the district are considered to be less than 50 years old.

*Id.* at 67.5(c). The Commonwealth Building was less than fifty years old when South Hill was designated an Historic District. It was objectively a non-contributing structure when the Historic District was formed. And the Planning Commission concluded that the historical attributes of the district were based on architecture from the 19th and early 20th centuries. Like the circuit court,

35

we believe Bluegrass Trust made a strong showing before the Planning Commission. But the Planning Commission obviously did not believe a strong justification had been presented demonstrating the historical or architectural value of a mid-twentieth century building to the South Hill Historic District. Bluegrass Trust, however, points to the State Historic Preservation Office, and testimony to the effect that it has the Commonwealth Building listed as a contributing structure. But 36 C.F.R. § 67.5(f) only states, "[a]dditional guidance on certifications of historic significance is available from SHPOs and NPS WASO." In brief, even the federal regulations do not assign controlling weight to designations by state preservation offices, merely referring to them for "additional guidance." Kentucky's Historic Preservation Office believes the Commonwealth Building is a contributing structure mainly due to its mid-twentieth century design. The Planning Commission, however, focused on the older designs that formed the basis for creating the South Hill Historic District in the first place, and concluded a mid-twentieth century design is "dramatically different" from the other structures in the district.

No one disputes the Planning Commission was empowered to make the decision whether the Commonwealth Building is a contributing structure to the historic character of South Hill. Historic contribution is indeed in the eyes of the beholder. That beholder in this case is the Planning Commission, not staff, regardless of their expertise. We cannot say its decision was arbitrary.

36

## IV.    Conclusion

For the aforementioned reasons, we reverse the Court of Appeals on the constitutionality of KRS 100.3471(1). We otherwise affirm the trial court's decision and uphold the Planning Commission's action to affirm the certificate of demolition of the Commonwealth Building.

All sitting. Lambert, Nickell, and Thompson, JJ., concur. VanMeter, C.J., concurs in part and dissents in part by separate opinion in which Bisig and Keller, JJ., join.

VANMETER, C.J., CONCURRING IN PART AND DISSENTING IN PART: Two issues are presented.  The first is the is the constitutionality of the KRS 100.3471.  I respectfully dissent from the majority's opinion as to this issue, since, in my view, no provision of the Kentucky Constitution invalidates this statute.  The second is the trial court's resolution of the underlying dispute.  I concur with the majority in affirming the trial court in this respect.

## I.     Constitutionality of KRS 100.3471

As a general matter, this Court reviews questions of law, including the constitutionality of a statute, de novo. *Teco/Perry Cnty. Coal v. Feltner*, 582 S.W.3d 42, 45 (Ky. 2019); *Adams v. Sietsema*, 533 S.W.3d 172, 177 (Ky. 2017); *Parker v. Webster Cnty. Coal, LLC*, 529 S.W.3d 759, 765 (Ky. 2017). "In considering an attack on the constitutionality of legislation, our jurisprudence has continually resolved any doubt in favor of constitutionality rather than unconstitutionality." *Hallahan v. Mittlebeeler*, 373 S.W.2d 726, 727 (Ky. 1963) (citing *Reynolds Metal Co. v. Martin*, 269 Ky. 378, 381-82, 107 S.W.2d 251, 253

37

(1937)).  In determining the constitutionality of a statute, "[o]ur functions are to determine the constitutional validity and to declare the meaning of what the legislative department has done.  We have no other concern." *Teco*, 582 S.W.3d at 45 (quoting *Johnson v. Commonwealth ex rel. Meredith*, 291 Ky. 829, 833, 165 S.W.2d 820, 823 (1942)).  "[T]he propriety, wisdom and expediency of statutory enactments are exclusively legislative matters." *Hallahan*, 373 S.W.2d at 727 (citing *Craig v. O'Rear*, 199 Ky. 553, 557, 251 S.W. 828, 830 (1923)).  Further,

> courts are not at liberty to declare a statute invalid because, in their judgment, it may be unnecessary, or opposed to the best interests of the state. . . . [A]n act will not be declared void on the ground that it is opposed to the spirit supposed to pervade the Constitution, or is against the nature and spirit of the government, or is contrary to the general principles of liberty, or the genius of a free people.

*Craig*, 199 Ky. at 557-58, 251 S.W. at 830 (citations omitted).

### A. Planning and Zoning Generally.

This Court has held on numerous occasions that land-use planning and zoning matters, as essentially administrative proceedings, constitute special statutory proceedings and the zoning decisions and legislative action taken therefrom are not the equivalent of court proceedings and their attendant rulings.  *Seiller Waterman, LLC v. Bardstown Cap. Corp.*, 643 S.W.3d 68, 80 (Ky. 2022); *Kenton Cnty. Bd. of Adjustment v. Meitzen*, 607 S.W.3d 586, 593-94 (Ky. 2020).  Good reason exists for this rule.  Planning and zoning matters are essentially local legislative matters, which do not involve judicial functions as commonly understood.  *See Hilltop Basic Res., Inc. v. Cnty. of Boone*, 180

38

S.W.3d 464, 468 (Ky. 2005) (holding that legislative bodies making zoning determinations are not performing judicial functions); *City of Louisville v. McDonald*, 470 S.W.2d 173, 178–79 (Ky. 1971) ("it is, nevertheless, true that rezoning a parcel of property is intrinsically not a judicial function"). "An appeal from an administrative decision is a matter of legislative grace and not a right." *Seiler Waterman*, 643 S.W.3d at 80 (quoting *Taylor v. Duke*, 896 S.W.2d 618, 621 (Ky. App. 1995)). Thus, the failure to follow the statutory guidelines for such an appeal is fatal. A person seeking review of administrative decisions must strictly follow the applicable procedures. *Seiler Waterman*, 643 S.W3d at 80; *Kenton Cnty.*, 607 S.W.3d at 594; *Triad Dev./Alta Glyne, Inc. v. Gellhaus*, 150 S.W.3d 43, 47 (Ky. 2004). In two places, our procedural rules recognize the primacy of the legislature in setting guidelines for special statutory proceedings. *See* CR[9] 1(2) (providing "[t]hese Rules govern procedure and practice in all actions of a civil nature in the Court of Justice except for **special statutory proceedings**, in which the procedural requirements of the statute shall prevail over any inconsistent procedures set forth in the Rules[.]") (emphasis added); RAP[10] 1(A) (providing "[t]hese rules govern appellate procedure in all Kentucky courts, except for **special statutory proceedings in the Court of Appeals**. . . . In **special statutory proceedings**, the procedural requirements of the governing statutes prevail over any inconsistent procedures prescribed by these rules[]") (emphasis added).

---

[9] Kentucky Rules of Civil Procedure.

[10] Kentucky Rules of Appellate Procedure.

39

### B. KRS 100.3471 Does Not Violate Equal Protection of the Laws as Guaranteed by Sections 1, 2 and 3 of the Kentucky Constitution.

Unlike the Fourteenth Amendment to the United States Constitution, the Kentucky Constitution nowhere explicitly guarantees equal protection of the law. That noted, this Court has consistently held that our Commonwealth's guarantee of equal protection emanates from Sections 1,[11] 2[12] and 3[13] of our Constitution. *E.g., Bloyer v. Commonwealth,* 647 S.W.3d 219, 226 (Ky. 2022)*; D.F. v. Codell,* 127 S.W.3d 571, 575 (Ky. 2003). In *Zuckerman v. Bevin*, this Court stated,

> the goal of equal protection provisions is to keep governmental decisionmakers from treating differently persons who are in all relevant respects alike. However, because nearly all legislation differentiates in some manner between different classes of persons, neither the federal nor state constitutions forbid such classification per se. Accordingly, the level of judicial scrutiny applied to an equal protection challenge depends on the classification made in the statute and the interest affected by it.

565 S.W.3d 580, 595 (Ky. 2018) (internal citations and quotations omitted).

Our case law, as well as federal case law, recognizes three levels of review may apply to equal protection challenges. *See, e.g., Steven Lee Enters. v. Varney*, 36 S.W.3d 391, 394-95 (Ky. 2000). The first level of review, strict scrutiny, applies whenever a statute makes a classification based on a

---

[11] Section 1 provides that "[a]ll men are, by nature, free and equal," and possess "inherent and inalienable rights", including "life, liberty, worship, pursuit of safety and happiness, free speech, acquiring and protecting property, peaceable assembly, redress of grievances, bearing arms[.]" KY. CONST. § 1.

[12] Section 2 sets forth the prohibition of absolute and arbitrary power. KY. CONST. § 2.

[13] Section 3 provides for equality of all persons and prohibits any "grant of exclusive, separate public emoluments or privileges shall be made to any man or set of men, except in consideration of public services[.]" KY. CONST. § 3.

40

"suspect" class. *See Codell*, 127 S.W.3d at 575-76 (discussing strict scrutiny). In *Varney*, for example, race, alienage, and ancestry were noted as suspect classes. 36 S.W.3d at 394. In such cases, or when a statute affects a fundamental right, a statute is "sustainable only if [it] is suitably tailored to serve a 'compelling state interest.'" *Id.* (citation omitted).

An argument is made that KRS 100.3471 impermissibly burdens a party's fundamental and constitutional right of appeal. KY. CONST. § 115. This argument, however, ignores that no right of appeal exists in land-use planning cases. *Seiller Waterman*, 643 S.W.3d at 80. Because any appeal in these matters exists only as a result of legislative grace, and not of right, *id.*, the legislature's decision to impose an appeal bond does not implicate a fundamental right. Strict scrutiny does not apply.

The second level of review, heightened rational basis scrutiny, applies to quasi-suspect classes, such as gender or illegitimacy. *Id.* Under this standard, "discriminatory laws survive equal protection analysis only 'to the extent they are substantially related to a legitimate state interest.'" *Id.* (quoting *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985)). No quasi-suspect class is involved in these cases.

Finally, the third level of review is for those classifications which impact social or economic policy. These statutes are subject to a less searching form of judicial scrutiny, *i.e.*, the "rational basis" test. *Codell*, 127 S.W.3d at 575 (citation omitted). No one can possibly argue that KRS 100.3471 impacts anything more than social or economic policy, through land-use planning and

41

zoning. Under the bill as enacted, the legislature included the following emergency clause:

> Whereas it is desirable to curb unnecessary appeals of land use cases, which appeals burden the courts, cause loss of jobs and loss of tax revenue, and many times render time-sensitive projects such as multifamily affordable housing projects undevelopable, an emergency is declared to exist, and this Act takes effect upon its passage and approval by the Governor or upon its otherwise becoming a law.

Act of Apr. 11, 2017, ch. 181 § 2, 2017 Ky. Acts 1448.

The challenger to a statutory distinction based on equal protection has the burden "to establish that the statutory distinction is without a rational basis." *Mobley v. Armstrong*, 978 S.W.2d 307, 309 (Ky. 1998). And, "[a] person challenging a law upon equal protection grounds under the rational basis test has a very difficult task because a law must be upheld if . . . any reasonably conceivable state of facts . . . could provide a rational basis for the classification." *Commonwealth ex rel. Stumbo v. Crutchfield*, 157 S.W.3d 621, 624 (Ky. 2005). Statutes are presumed to be constitutional and the Commonwealth has no burden to produce evidence supporting the rationality of any statutory classifications. *Commonwealth v. Howard*, 969 S.W.2d 700, 703 (Ky. 1998).

The distinction or classification which forms the basis for the equal protection challenge is not exactly clear, as different challengers argue different classifications: wealthy or indigent appellants; developers; governmental units; land use appeals; landfills. While the emergency clause, quoted above, seems to benefit a property developer, the statute is not so written. Any and all

42

parties appealing a land-use or zoning decision, whether neighboring property owner, non-profit organization or even developer, will bear the possible financial risk of an appeal.

The statute generally exempts governmental entities and landfills from its provisions. KRS 100.3471(5). As to governmental entities, KRS 100.3471(5) is essentially the same as CR 81A, RAP 63(E) and KRS 454.190, all of which exempt such entities from posting any bonds. *See* DAVID V. KRAMER, 7 KY. PRACTICE (Thomson Reuters 2023 ed.) Rule 81A, Comment 1 (stating "[t]hese sources recognize the impracticality of having the Commonwealth of Kentucky and the United States execute bonds as private litigants in order to follow some course of proceeding in a lawsuit[]"). As to landfills, two chapters of the Kentucky Revised Statutes contain extensive regulation of such use. *See generally* KRS Chapter 109 (Local Solid Waste Management) and 224 (Environmental Protection). The potential hazards due to the creation or expansion of landfills thus justifies their being treated differently than more routine land use and zoning matters.

*Elk Horn Coal Corp. v. Cheyenne Resources, Inc.*, 163 S.W.3d 408 (Ky. 2005), overruled on other grounds by *Calloway Cnty. Sheriff's Dep't v. Woodall*, 607 S.W.3d 557 (Ky. 2020), does not compel a different result. At issue in *Elk Horn*, was the constitutionality of KRS 26A.300 which imposed a 10% penalty on the appellant for a second unsuccessful appeal as to a judgment for the collection of money. The penalty was automatically applied in the event the

43

judgment was affirmed or the appeal dismissed after being docketed in the appellate court.[14]

This Court discussed the history of appeals penalties in this Commonwealth, noting that at one time they applied to all cases upon affirmance or dismissal of any appeal from a superseded judgment for the payment of money. *Id.* at 412-13. As to KRS 26A.300,[15] the Court noted its applicability "only to unsuccessful appellants in second appeals *from superseded money judgments.*" The Court then stated,

> Notably, a penalty is not assessed against other unsuccessful appellants in second appeals, *e.g.*, unsuccessful plaintiff-appellants, unsuccessful defendant-appellants who do not supersede a money judgment awarded against them, and unsuccessful appellants from non-money judgments. Clearly KRS 26A.300 does not treat all unsuccessful appellants in second appeals the same, and, as such, it is discriminatory.

*Id.* at 413. The Court recognized that rational basis review applied to its analysis, and held that the only purpose behind the 10% penalty was to discourage frivolous appeals. *Id.* at 414-15. It stated "[p]enalty statutes like KRS 26A.300, are not intended to compensate an appellee for delay in receiving a money judgment; rather, such statutes are intended to discourage frivolous appeals." *Id.* at 414. This distinguished that purpose from compensating a

---

[14] KRS 26A.300(2), states in full,

> When collection of a judgment for the payment of money has been stayed as provided in the Rules of Civil Procedure pending any other appeal, damages of ten percent (10%) on the amount stayed shall be imposed against the appellant in the event the judgment is affirmed or the appeal is dismissed after having been docketed in an appellate court.

[15] Notwithstanding the decision in *Elk Horn Coal*, KRS 26A.300 has not been repealed.

judgment creditor for the delay since post-judgment interest "more than adequately compensates for the delay." *Id.* at 414.

KRS 100.3471 is different in kind. In the context of planning and zoning, no party typically seeks or possesses a monetary judgment. A developer seeks to develop property for business, industrial or residential purposes. Adjacent property owners may object, but normally, other than attorney fees, they may have no direct pecuniary interest at stake. As argued by the Attorney General, and beyond the purpose expressed by the legislature's emergency clause, the statute requires the appellants to have some "skin in the game." This is true whether the appeal is presumptively frivolous or not presumptively frivolous. Furthermore, that "skin" is not determined by means of an automatic penalty, but is to be thoughtfully determined by a circuit judge who is already familiar with the facts, is based on costs that an appellee may suffer or incur during the appeal, and is statutorily limited. KRS 100.3471(3)(c)-(d).

And even after an unsuccessful appeal, an appellant does not necessarily suffer the repercussions of an automatic sanction. KRS 100.3471(4)(a) requires a motion and a hearing in the circuit court for that court "to determine the actual costs and damages to be paid to the appellee under the appeal bond." The court is required to hold the requested hearing within 30 days and issue findings of fact within 30 days; costs and damages are limited to the amount of the appeal bond. KRS 100.3471(4)(b)-(c). Because the legislature has required factual findings, a party aggrieved by the results of the hearing

45

and order has a right of appeal. Finally, if neither party moves the circuit court within 60 days, the court may release the appeal bond. KRS 100.3471(4)(d).

Another possibility, of course, is that an appellant prevails on its appeal. The appellant complains that the effect of the statute is that if it appeals and prevails, it will still bear the risk of paying the appellee's costs and damages. While I am somewhat dubious that a circuit court will award costs and damages against a prevailing appellant, a better course is to await deciding this question until it is ripe for adjudication. *See Bingham Greenebaum Doll, LLP v. Lawrence*, 567 S.W.3d 127, 129-30 (Ky. 2018) (stating "a fundamental tenet of Kentucky jurisprudence [is] that courts cannot decide matters that have not yet ripened into concrete disputes[]"). All other questions regarding the application and interpretation of this statute, such as hardship to an indigent appellant who has no means to post an appeals bond,[16] the standard of review, or resolution of any number of issues that might arise, can await another day.

### C. KRS 100.3471 is Authorized Under Section 111(2) and Therefore Does Not Violate Sections 115 and 116 of the Kentucky Constitution.

Another claim is that the statute violates Sections 115 and 116. Section 115 provides "[i]n all cases, civil and criminal, there shall be allowed as a matter of right at least one appeal to another court[,]" and that "[p]rocedural rules shall provide for expeditious and inexpensive appeals." Section 116 grants this Court "the power to prescribe rules governing its appellate

---

[16] In the three cases decided today involving the constitutionality of KRS 100.3471, no appellant demonstrated an inability to post the appeals bond set by the circuit courts.

46

jurisdiction . . . and rules of practice and procedure for the Court of Justice."

However, as aptly argued, these sections must be balanced against Kentucky

Constitution Section 111(2):

> The Court of Appeals shall have appellate jurisdiction only, except that it may be authorized by rules of the Supreme Court to review directly decisions of administrative agencies of the Commonwealth, and it may issue all writs necessary in aid of its appellate jurisdiction, or the complete determination of any cause within its appellate jurisdiction.  In all other cases, it shall exercise appellate jurisdiction as provided by law.

In *Commonwealth v. Farmer*, 423 S.W.3d 690, 692 (Ky. 2014), this Court

held "[t]he 'as provided by law' language in the second sentence of Section

111(2) authorizes the legislature to prescribe the appellate jurisdiction of the

Court of Appeals."  The legislature has provided generally for the Court of

Appeals appellate jurisdiction in KRS 22A.020.  This general grant, however, is

subject to specific limitations.  One such limitation appears in KRS 22A.020(3)

that "there shall be no review by appeal or by writ of certiorari from that

portion of a final judgment, order or decree of a Circuit Court dissolving a

marriage."  And another specific limitation is KRS 100.3471.  Along these same

lines, the legislature has enacted KRS 446.190, that "[w]here a statute grants a

right of appeal to the Court of Appeals in **special civil cases**, the Rules of Civil

Procedure shall govern the taking of the appeal, **unless in conflict with a

specific provision of the statute**[.]" (emphasis added).  And, as previously

noted, CR 1(2) and RAP 1(A) contain exceptions for special statutory

proceedings.  Section 111(2)'s authority, as well as our own rules recognizing

the primacy of the legislature in special statutory proceedings, resolves any

47

claim that the legislature is infringing on our rule-making authority under Section 116, or is somehow violating Section 28's strict requirement of separation of powers.

Planning and zoning matters are special statutory proceedings, and the legislature may validly impose reasonable conditions or restrictions on the right of appeal in such matters. In this case, the legislature did not prohibit review from a local planning/zoning decision, or require a blanket prohibition on post-circuit court review, or set a punitive appeal bond amount which appears patently excessive or arbitrary. Instead, it provided a mechanism for the circuit court judge to review the proceeding anew to determine whether the filed appeal is presumptively frivolous or not frivolous. The statute requires the circuit judge to conduct a hearing and make findings of fact, KRS 100.3471(3)(a), and consider, among other non-listed factors, whether the appeal is of a ministerial or discretionary decision, and whether a reasoned interpretation supports the appellant's position. KRS 100.3471(3)(b). Either way, the circuit judge then sets a reasonable appeal bond based on evidence up to the statutory maximum limit, either $250,000 (presumptively frivolous) or $100,000 (not presumptively frivolous). The appellee bears the burden of proving its costs and damages by sufficient evidence in order for the circuit court to set the appeal bond. KRS 100.3471(3)(e). The appellant, as a party, obviously has the ability to appear at that hearing and contest the appellee's proof. And, after the final and nonappealable decision in the matter, costs and damages are limited to the amount of the appeal bond. KRS 100.3471(4)(c).

48

KRS 100.3471 is no different from other special statutory proceedings in which the legislature conditioned court access on the ability of parties to post bonds or bear costs. *See* KRS 120.185(1)(e) (requiring election challenger to post bond with approved surety for costs of recount); *Moore v. Roberts ex rel. Roberts*, 684 S.W.2d 276, 278 (Ky. 1982) (rejecting insurer's argument that assessment of damages or attorney's fees from first appeal violated KY. CONST. § 115 as a penalty on its right of appeal, but instead was "an item of monetary damages allowed by legislature due to continuing representation upon issue of reasonableness[]"). As succinctly stated by this Court in *Moore*, "[a]n appeal is always at one's peril." *Id.*

Finally, KRS 100.3471, the statute does not constitute local or special legislation in violation of Sections 59 and 60.

## II. Merits of Underlying Dispute

With respect to the underlying dispute, the Lexington-Fayette Urban County Planning Commission determined to issue a demolition permit, which was affirmed by the circuit court. While I would affirm the Court of Appeals' opinion dismissing the Bluegrass Trust's appeal, I agree, in the interest of judicial economy, that we can and should determine the merits, since the parties have adequately presented the record and their arguments to us. I therefore concur with the majority's opinion which affirms the Fayette Circuit Court's judgment.

Bisig and Keller, JJ., join.

49

COUNSEL FOR APPELLANT,
BLUEGRASS TRUST FOR
HISTORIC PRESERVATION:

Jessica Katherine Winters
The Winters Law Group, LLC

COUNSEL FOR APPELLEE,
LEXINGTON-FAYETTE URBAN
COUNTY GOVERNMENT
PLANNING COMMISSION:

Emilee Ann Buttrum
The City of Georgetown

Tracy Webb Jones
LFUCG, Department of Law


COUNSEL FOR APPELLEE,
COMMONWEALTH OF
KENTUCKY, EX REL.
RUSSELL COLEMAN:

Matthew Franklin Kuhn
Elizabeth Themins Hedges
Office of the Attorney General

COUNSEL FOR APPELLEE,
THE RESIDENCES AT SOUTH
HILL, LLC:

William M. Lear, Jr.
George "Nick" Edward Nicholson III
Stoll Keenon Ogden PLLC

Nealy Ranell Williams
University of Kentucky Law

COUNSEL FOR APPELLEE,
WILLIAM WILSON:

Tracy Webb Jones
LFUCG-Department of Law

50

COUNSEL FOR AMICUS,
KENTUCKY CHAMBER OF COMMERCE:

Brent Robert Baughman
Phillip Branden Gross
Aaron William Marcus
Job Darbin Turner, III
Dentons Bingham Greenbaum, LLP


COUNSEL FOR AMICUS,
KENTUCKY RESOURCES COUNSIL, INC.:

Thomas Joseph FitzGerald
Ashley Dye Wilmes
Kentucky Resources Council


COUNSEL FOR AMICUS:
ASBURY PARK HOA, INC.; BERRYTOWN
NEIGHBORHOOD ASSOCIATION, INC.;
BONNYCASTLE HOMESTEAD ASSOCIATION,
INC.; CEDAR CREEK GARDENS HOMEOWNERS
ASSOCIATION, INC.; CITIZEN COALITION
FOR LDC REFORM; FISHERVILLE AREA
NEIGHBORHOOD ASSOCIATION, INC.;
FRIENDS OF FLOYDS FORK LLC; FRIENDS
OF LOUISVILLE PUBLIC ART; HURSTBOURNE
TOWNEHOMES RESIDENTS ASSOCIATION, INC.;
INDIAN SPRINGS COMMUNITY ASSOCIATION, INC.;
IRISH HILL NEIGHBORHOOD ASSOCIATION, INC.;
LOUISVILLE HISTORICAL LEAGUE, INC.; MURRAY
HEIGHTS NEIGHBORHOOD CONNECTION; OPEN
LOUISVILLE, INC.; RIDGEWAY NEIGHBORS AND
FRIENDS; SCOTT COUNTY NEIGHBORS FOR
SAFETY AND HEALTH; SIERRA CLUB INC. KENTUCKY;
TUCKER STATION NEIGHBORHOOD ASSOCIATION, INC.:
WINDING BROOK SUBDIVISION HOA, INC.; AND
WOLF PEN PRESERVATION ASSOCIATION, INC.:

Stephen T. Porter

COUNSEL FOR AMICUS,
PRESERVATION KENTUCKY, INC.:

Randal Alan Strobo

51

Strobo Barkley PLLC